No objections to this Report and Recommendation (the "R&R") have been received, and accordingly I review it for clear error. Finding no error, clear or otherwise, I adopt the R&R as the decision of the Court. Plaintiff's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion for judgment on the pleadings is granted. The Clerk of Court is respectfully directed to terminate Docs. 16 and 18, enter judgment for the Commissioner, and close the case.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DIANA CRUZ O/B/O AET,

                    Plaintiff,

      -against-

ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
-------------------------------------------------------------X

SO ORDERED.

CATHY SEIBEL, U.S.D.J.

7/19/21

**REPORT AND
RECOMMENDATION**

20 Civ. 1045 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Diana Cruz ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("Commissioner"), which denied Plaintiff's application for Child Supplemental Security Income ("SSI") benefits on behalf of her minor daughter ("A.E.T."). (Docket No. 1). Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 16), accompanied by Plaintiff's memorandum of law, (Docket No. 17) ("Pl. Br."); and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 18), accompanied by the Commissioner's memorandum of law, (Docket No. 19) ("Comm'r Br."). For the reasons that follow, I respectfully recommend that Plaintiff's motion be denied and the Commissioner's cross-motion be granted.

## I. BACKGROUND

On April 24, 2015, Plaintiff applied for SSI on behalf of A.E.T., alleging that A.E.T. was disabled beginning April 1, 2015. (R.[1] 10). Plaintiff's application was initially denied on August

---

[1] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on August 3, 2020. (Docket No. 13). All page number citations to the certified administrative record refer to the page number assigned by the SSA.

26, 2015, (*id.*), after which she requested a hearing, (*id.*).  A hearing was held on October 2, 2017

before Administrative Law Judge ("ALJ") David Suna ("ALJ Suna"). (R. 58–85).  ALJ Suna

issued a decision on December 29, 2017 denying Plaintiff's claim. (R. 10–27).  Plaintiff

requested review by the Appeals Council, which denied her request on September 28, 2018, (R.

1–3), making the ALJ's decision ripe for review.

**A. Medical Evidence After the Disability Onset Date**

A.E.T. was born on January 19, 2006. (R. 243).  At all relevant times, A.E.T. was older

than 6 years old, but had not yet attained the age of 12, and was therefore a school-age child as

defined by the Social Security Act ("Act"). *See* 20 C.F.R. § 416.926a.  A.E.T. received treatment

during the relevant period from various medical professionals for Attention-Deficit/

Hyperactivity Disorder ("ADHD"), oppositional defiant disorder ("ODD"), and insulin-

dependent diabetes mellitus ("IDDM").

**1. Opinions of Treating Health Care Professionals**

**i. Yolaine St. Louis, M.D.**

A.E.T. was treated by Yolaine St. Louis, M.D. ("Dr. St. Louis"), a pediatric

endocrinologist at Bronx-Lebanon Hospital ("Bronx-Lebanon"), from November 27, 2013 to

March 18, 2015. (R. 356).  Dr. St. Louis prepared a Physician's Report for a Child's Claim of

Disability on January 9, 2015, in which she noted that A.E.T. was diagnosed with IDDM, a

mood disorder and disruptive behavior. (R. 356–61).  Dr. St. Louis additionally indicated that

A.E.T. had a learning disability but stated that she could not assess the extent of the disability in

her role as an endocrinologist. (R. 359).  Dr. St. Louis described A.E.T.'s diabetes control as

"poor" and remarked that A.E.T. took Lantus and Novolog to better control her IDDM, neither

of which limited her activities. (R. 357–58).

Subsequent to a March 18, 2015 appointment, Dr. St. Louis reported that A.E.T.'s glucose levels were erratic, ranging from 76 to 425, and were "too often over 200." (R. 459). Dr. St. Louis remarked that although Plaintiff tracked A.E.T.'s glucose readings in a logbook, "the readings in the book do not match those in the meter," and "[Plaintiff] tends to record only the near normal readings." (*Id.*). A.E.T.'s physical examination was "unremarkable" at this appointment. (*Id.*).

After a July 21, 2015 appointment, Dr. St. Louis wrote in A.E.T.'s treatment notes that A.E.T. had missed several sessions and that Plaintiff struggled to help A.E.T. comply with her treatment regimen. (R. 458). A.E.T.'s glucose levels remained erratic and were "very frequent[ly]" as high as 500. (*Id.*). Plaintiff admitted that she sometimes forgets to give A.E.T. her medication before she eats, as prescribed. (*Id.*). Dr. St. Louis also observed that A.E.T.'s diet was "poor," that she throws tantrums when she is not given cookies and candy, and that A.E.T.'s father sometimes tells A.E.T. that "she is on 'too much' insulin." (*Id.*). Dr. St. Louis recommended that A.E.T.'s parents attend a session on diabetes education. (*Id.*).

## ii. Ellis Armstein, M.D.

Ellis Armstein, M.D. ("Dr. Armstein"), a pediatrician at Bronx-Lebanon, treated A.E.T. from August 2008 to February 2012 and evaluated A.E.T. on February 17, 2012.[2] (R. 366–70). Dr. Armstein concluded in his evaluation that A.E.T. had marked limitations in the following areas: "initiating interaction or conversation" and "unintelligible speech when talking," which are subcategories of the interacting and relating with others domain; "keeping pace with other children," a subcategory of the attending and completing tasks domain; and "organizing self and belongings" and "maintaining ownership of space," which are subcategories of the caring for

---

[2] As noted *infra*, Section I(A)(3)(i), Dr. Armstein continued to observe A.E.T. until 2014, (R. 462), but did not provide a subsequent evaluation concerning A.E.T.'s functional limitations.

oneself domain. (R. 368–69).  Dr. Armstein further concluded that A.E.T. had extreme

limitations in the following areas: "unprovoked hostility" and "talking constantly," subcategories

of the interacting and relating with others domain; "following through on instructions," "carrying

out simple instructions," and "concentrating without adult supervision," subcategories of the

attending and completing tasks domain; "hurtful behavior," "following safety rules/avoiding

danger," and "crying for no apparent reason," subcategories of the caring for oneself domain;

participating in physical education, a subcategory of the moving about and manipulating objects

domain; and taking medication that may impair the child's concentration and taking medication

at school, subcategories of the health and physical well-being domain. (R. 368–70).

### iii.  Montefiore Behavioral Health Center Evaluation

The record includes a Children's Mental and Psychological Impairment Evaluation

prepared by a provider from Montefiore Behavioral Health Center[3] who treated A.E.T. from

February 9, 2015 to April 23, 2015. (R. 362).  The evaluator concluded that A.E.T. had less than

marked difficulties in acquiring and using information, attending and completing tasks, caring

for oneself, and health and physical well-being. (R. 364–65).  The evaluator further determined

that the interacting and relating with others domain was "not applicable." (R. 365).  The

evaluator did not assess A.E.T.'s functioning in the moving about and manipulating objects

domain. (*Id.*).

### 2.  Opinions of Nontreating Health Care Professionals

The following nontreating health care professionals provided opinions concerning

A.E.T.'s functioning: (1) Leslie A. Wilson, M.D. ("Dr. Wilson"); (2) Steven Tsoutsouras, M.D.

---

[3] The evaluation is neither signed nor dated. (*See* R. 365).  Since the records indicate that the evaluator began treating A.E.T. on February 9, 2015 — the date A.E.T. commenced treatment at Montefiore Behavioral Health Center — the Court infers that the foregoing evaluation was completed by a treating provider at Montefiore.

("Dr. Tsoutsouras"); (3) Mindy Singer M.A. CCC-SLP ("Singer"); and (4) S. Marinaro

("Marinaro"), a state agency consultant affiliated with Montefiore Hospital ("Montefiore").

**i.  Leslie A. Wilson, M.D. – Responses to Medical Interrogatories**

Dr. Wilson, a pediatrician and medical expert consultant,[4] submitted responses to medical

interrogatories on November 14, 2017. (R. 611–18).  Dr. Wilson opined that A.E.T. suffered the

following medical impairments: ADHD, ODD/disruptive disorder and IDDM. (R. 612).  Dr.

Wilson concluded that A.E.T.'s impairments were severe, noting that A.E.T. had received

therapy in the past, had previously been psychiatrically hospitalized[5] and was taking

Risperidone. (*Id.*).

Dr. Wilson assessed A.E.T.'s functioning in each of the six functional domains used to

assess childhood disabilities.  First, Dr. Wilson found that A.E.T. had a less than marked

limitation in the acquiring and using information domain, noting that while A.E.T. read below

grade level, she also had "excellent comprehension skills." (R. 616).  He also considered

A.E.T.'s final fourth-grade report card. (*Id.*).  Second, Dr. Wilson determined that A.E.T. had a

less than marked limitation in the interacting and relating with others domain. (*Id.*).  In reaching

this conclusion, Dr. Wilson considered the 2016 Function Report's statements that A.E.T. kicks,

throws and breaks things at home, which tend to show that A.E.T. has at least some limitations in

this domain, in addition to comments on the 2013 and 2016 Individualized Education Plans

("IEPs") that A.E.T. is "well mannered," has "many friends" and is "really good at keeping

friends." (*Id.*).  Third, Dr. Wilson found that A.E.T. had a less than marked limitation in the

---

[4] Dr. Wilson submitted his curriculum vitae along with his interrogatory responses. (R. 346–49).

[5] The record indicates that A.E.T. was hospitalized for "aggression and auditory hallucinations," but does not specify when this hospitalization occurred. (R. 535).

caring for oneself domain. (*Id.*).  In reaching this conclusion, Dr. Wilson weighed the fact that

A.E.T. required assistance monitoring her diabetes and administering insulin with a remark on

her fourth-grade IEP that she participated in all aspects of the fourth-grade curriculum. (*Id.*).

Fourth, Dr. Wilson concluded that A.E.T. had no limitations in the attending and completing

tasks domain, noting that A.E.T.'s fourth-grade IEP did not indicate that she struggled to focus.

(*Id.*).  Fifth, Dr. Wilson relied on a comment on A.E.T.'s fourth-grade IEP that she fully

participated in gym class to determine that A.E.T.'s ability to move about and manipulate objects

was not limited. (R. 617).  Finally, Dr. Wilson concluded that A.E.T. had a less than marked

limitation in the health and physical well-being domain. (*Id.*).  He did not provide a reason for

this determination. (*See id.*).

### ii.  S. Marinaro – State Agency Consultant Opinion

A.E.T. was evaluated by Marinaro, a state agency consultant, on August 26, 2015. (R.

115).  Marinaro opined that A.E.T. had less than marked limitations in the acquiring and using

information, attending and completing tasks, moving about and manipulating objects, caring for

oneself and health and physical well-being domains. (R. 111–13).  Marinaro further opined that

A.E.T. had a marked limitation in the interacting and relating with others domain, mentioning

that A.E.T. displayed "oppositional and aggressive behavior" and was reported to have

"behavior[al] issues" at school. (R. 112).

### iii.  Steven Tsoutsouras, M.D. – Consultative Pediatric Examination

On September 20, 2016, Dr. Tsoutsouras, a pediatric consultative examiner, evaluated

A.E.T in connection with Plaintiff's claim for SSI. (R. 475–78).  Dr. Tsoutsouras's report

indicated that A.E.T. had been diagnosed with IDDM and ADHD, that A.E.T. repeated second

grade, and that she displayed behavioral problems at school. (R. 475–76).  A.E.T. told Dr.

Tsoutsouras during the examination that her typical daily activities included watching television,

listening to music, doing homework, reading, coloring and playing on her computer (*Id.*).  Dr. Tsoutsouras remarked that A.E.T.'s speech and behavior were normal for her age, that she related to him and his staff in an age-appropriate way, and that she "appeared to have a normal attention span for her age." (*Id.*).

### iv.  Mindy Singer, M.A. CCC-SLP – Speech and Language Evaluation

Singer administered the Clinical Evaluation of Language Fundamentals 5 examination, a speech and language evaluation, to A.E.T. on September 27, 2016. (R. 480).  A.E.T. scored in the fifth percentile in core language, the sixth percentile in receptive language and the fifth percentile in expressive language. (R. 481).  Based on A.E.T.'s examination results, Singer diagnosed A.E.T. with "mild receptive and expressive language delay[s]." (R. 482).  Signer opined that A.E.T. did not need to continue receiving speech and language services. (*Id.*).  Singer remarked in her report that A.E.T. neither readily engaged with her, nor demonstrated "reciprocal communication skills." (R. 480).  Singer also commented that as the testing continued, A.E.T. became more comfortable and followed requests, although at times, she was "prone to opposition." (*Id.*).  A.E.T.'s "eye contact remained poor throughout the testing."  Her "fund of personal knowledge was adequate." (*Id.*).

### 3.  Medical Records

### i.  Counseling at Bronx-Lebanon

A.E.T. received counseling at Bronx-Lebanon from August 15, 2012 to October 24, 2014. (R. 462).  During this time, A.E.T. was observed by Dr. Armstein. (*Id.*).  Plaintiff brought A.E.T. for treatment because A.E.T. was cursing, fighting at home and at school, and throwing tantrums. (*Id.*).  The record indicates, however, that during this time, A.E.T. "did well in school" and "showed academic progress." (*Id.*).  A.E.T. was diagnosed with ADHD and disruptive behavior disorder while at Bronx-Lebanon. (R. 465).  A.E.T.'s treatment was terminated on

December 8, 2014, because A.E.T. failed to attend appointments. (R. 462).  A mental status examination conducted at the time of A.E.T.'s discharge indicated that she had a "cooperative" attitude, "ok" mood, "normal" speech, an "appropriate" affect, a "logical" and "directed" thought process, "age appropriate" judgment, "adequate" impulse control and "intact" attention/concentration. (*Id.*).  A.E.T. was determined to have a global assessment of functioning ("GAF") score of 65. (*Id.*).

### ii.  Counseling at Montefiore

A.E.T. received counseling at Montefiore from February to June 2015 to address her "attitude" and behavioral problems at home. (R. 407–56).  A.E.T. attended counseling sessions with Myreille Polycarpe, M.D., ("Dr. Polycarpe"), Paula Singer, LCSW-R, Francis Hayden, M.D. ("Dr. Hayden") and Angela Grosso-Toscano ("Grosso-Toscano").[6]  A.E.T. was diagnosed with an anxiety disorder and ADHD impulsive type by her providers at Montefiore. (R. 455).  Plaintiff reported to A.E.T.'s providers that A.E.T. was previously prescribed Risperidone, which she stopped taking after experiencing hallucinations. (R. 452).  A.E.T. was further determined to have a GAF score of 56. (*Id.*).  Dr. Polycarpe performed a mental status examination on A.E.T. and determined that A.E.T. had a "happy" mood, "bright" affect, "normal" speech, "age appropriate" judgment, and "intact" attention, concentration and executive functioning. (R. 444).  Paula Singer also administered a mental status examination to A.E.T. and concluded that A.E.T. had a "normal" mood, an "appropriate" affect, "normal" speech, "mildly impaired" judgment, a "concrete" thought process and a "wonderful imagination." (R. 454).

---

[6] A.E.T. was treated by Dr. Polycarpe on March 25, 2015, May 13, 2015 and June 22, 2015.  A.E.T. was treated by Paula Singer on February 9, 2015, February 18, 2015, May 12, 2015 and June 9, 2015.  A.E.T. was treated by Dr. Hayden on May 21, 2015.  A.E.T. was treated by Grasso-Toscano on March 19, 2015, April 2, 2015 and April 16, 2015. (R. 404–56).

### iii.  Counseling at New York Psychotherapy and Counseling Center

A.E.T. received treatment from September 23, 2015 to February 1, 2017 at the New York Psychotherapy and Counseling Center ("NYPCC") where she underwent weekly psychotherapy with Madelline Zaiter ("Zaiter")[7] and monthly medication management with Lizzet Garcia, M.D. ("Dr. Garcia").[8] (R. 489–598).  Dr. Garcia restarted A.E.T. on Risperidone on December 12, 2015. (R. 508).  Plaintiff told Dr. Garcia that "the medication [worked] for A.E.T.," whose focus and behavior improved. (R. 573).  A.E.T. reported to Dr. Garcia that the Risperidone helped her sleep and feel calm, but made her "sleepy." (R. 583).  On February 26, 2016, Plaintiff told Dr. Garcia that she had not received any complaints from A.E.T.'s school and that A.E.T. was behaving better. (R. 518).  On May 26, 2016, Plaintiff reported that A.E.T. suffered two panic attacks during the preceding week. (R. 540).  Dr. Garcia asked Plaintiff to follow up with A.E.T.'s pediatrician, as her anxiety may have been related to her insulin dosage. (*Id.*).  A.E.T. was frequently absent from sessions.  On January 31, 2017, the NYPCC ceased treating A.E.T. due to her non-compliance with its attendance policy. (R. 595).

---

[7] A.E.T. was seen by Zaiter on October 10, 2015, October 20, 2015, October 27, 2015, November 3, 2015, November 10, 2015, November 17, 2015, December 1, 2015, December 8, 2015, December 15, 2015, December 29, 2015, January 12, 2016, January 26, 2016, February 2, 2016, February 16, 2016, February 24, 2016, March 9, 2016, March 16, 2016, April 6, 2016, April 13, 2016, April 20, 2016, April 26, 2016, May 4, 2016, May 11, 2016, May 18, 2016, May 25, 2016, June 18, 2016, June 22, 2016, June 25, 2016, July 2, 2016, July 23, 2016, August 3, 2016, August 20, 2016, August 24, 2016, September 21, 2016, October 15, 2016, October 29, 2016, November 4, 2016, November 8, 2016, December 20, 2016 and January 10, 2017. (R. 491, 494, 495, 496, 498, 500, 503, 505, 507, 510, 511, 513, 515, 519, 523, 526, 529, 531, 533, 536, 541, 543, 545, 547, 549, 552, 555, 563, 565, 569, 573, 576, 578, 581, 586, 592).

[8] A.E.T. was treated by Dr. Garcia on January 9, 2016, February 6, 2016, March 5, 2016, April 23, 2016, May 21, 2016, June 25, 2016, July 31, 2016, August 28, 2016 and December 6, 2016. (R. 512, 518, 525, 535, 540, 551, 558, 566, 588).  James Herivaux, M.D. treated A.E.T. in Dr. Garcia's absence on November 5, 2016. (R. 583).

**B. Nonmedical Evidence**

**1. 2013 Individualized Education Plan**

On October 21, 2013, the New York City Department of Education prepared an IEP for A.E.T ("2013 IEP"), who was in second grade at the time. (R. 253–67). The IEP indicated that A.E.T. struggled in all academic areas and had "difficulty following instructions and completing her work in a timely manner." (R. 253). A.E.T. was described by her teacher as "a pleasant and cooperative girl," who "appears motivated to go to school" and has "many friends." (R. 255). Her teacher further described her as a "respectful, cooperative, extremely quiet and agreeable youngster," who "often appears sad and anxious." (*Id.*).

**2. 2016 Individualized Education Plan**

A.E.T.'s fourth-grade IEP was implemented on November 11, 2016 ("2016 IEP"). (R. 220). A.E.T. received a fluency score of 3 in reading, "which is indicative of someone who reads in large meaningful phrases, mostly smooth, and with expressive interpretation." (R. 330). The IEP further remarked that A.E.T. had "excellent comprehension skills," but needed additional help "determining word meanings and with cause and effect relationships." (*Id.*). With respect to writing, A.E.T. demonstrated "strength in word choice," was able to include an introduction and conclusion in her writing, and could elaborate with a variety of information, organize her work, and use transition words. (*Id.*). A.E.T. was, however, unable to write a conclusion that restates the main idea. (*Id.*). Furthermore, A.E.T. could "express numbers using tens and ones, solve basic subtraction facts, . . . solve problems including counting [money]" and construct and interpret bar graphs, (*id.*), but struggled to "add and subtract using regrouping [and] select[] the proper operation to solve real-world and mathematical word problems." (*Id.*). A.E.T. was described by her teacher as a "well mannered" girl, who "is able to fully participate in every aspect of the 4th grade curriculum" and "is really good at keeping friends." (R. 330–31).

Furthermore, an undated IEP Progress Report indicated that A.E.T. "made progress" toward her goal of implementing problem solving skills to identify issues interfering with her learning, and that it was anticipated that she would meet her goal. (R. 340). A second undated IEP Progress Report indicated that A.E.T. made "little progress" toward her goal of properly utilizing an effective conclusion statement in her writing, but that it was anticipated that she would meet this goal. (R. 341). A third undated IEP Progress Report indicated that A.E.T. made "little progress" toward her goal of working with multiplication/division families, but that it was anticipated that she would meet this goal. (R. 343). Finally, a fourth undated IEP Progress Report stated that A.E.T. made "little progress" toward her goal of determining the meaning of "domain specific words using context clues," but was expected to meet that goal. (R. 342).

### 3. Fourth-Grade Report Card

A.E.T. earned the following final grades in her fourth-grade courses: 70 in English language arts, 54 in mathematics, 84 in science, 88 in social studies and history and 80 in academic and personal behaviors. (R. 339). A.E.T.'s final marks were significantly higher than her grades from the first marking period, during which she earned a 26 in English language arts, a 52 in mathematics, a 60 in science and a 60 in social studies and history. (*Id.*).

### 4. 2016 Function Report

Plaintiff completed a function report on June 16, 2015 ("2016 Function Report") on behalf of A.E.T. (R. 270–79). Plaintiff indicated that A.E.T. had difficulty seeing and hearing and limited communication abilities. (R. 269). The report further indicated that A.E.T. was unable to write in cursive, write a simple 6 to 7 sentence story, or tell time. (R. 274). Regarding physical impairments, Plaintiff stated that A.E.T. could not ride a bike, jump rope, roller skate, swim or use scissors, and that her impairments affected her behavior with others. (R. 275–76). Plaintiff also stated that A.E.T. did not play team sports and was unable to tie her shoelaces,

bathe independently, wash or brush her hair, eat using utensils, help around the house or accept

criticism. (R. 277).  Plaintiff further indicated that A.E.T. struggled to pay attention and stick to

tasks. (R. 278).

## C.  Hearing Testimony

David Berger, Esq. represented Plaintiff at the October 2, 2017 hearing. (R. 62–90).

A.E.T. was 11 years old and in the fifth grade at the time of the hearing. (R. 67).  A.E.T. testified

that math is her favorite subject and that she plays hide-and-seek, kickball, dodgeball and

basketball with her friends after school. (R. 68–69).  While at home, A.E.T. watches television,

reads books and plays with her dog. (R. 72).  A.E.T. cleans her room once a week. (R. 71).  She

does not get along with her brother. (R. 70).  Plaintiff also testified at the hearing. (R. 75–88).

Plaintiff told the ALJ that A.E.T. was diagnosed with ADHD and Schizophrenia.[9] (R. 77).

Plaintiff further testified that A.E.T. displayed behavioral problems at home, including hitting

family members. (R. 78–79).  A.E.T. suffers from stomach pain and a racing heartbeat as a result

of her diabetes. (R. 80).  She often misses school to attend doctor's appointments. (R. 83).

## D.  The ALJ's Decision

ALJ Suna applied the three-step procedure established by the Commissioner for

evaluating whether an individual under the age of 18 is disabled in his October 2, 2017 decision.

(R. 11 (citing 20 C.F.R. § 416.924(a)).  At step one, the ALJ found that A.E.T. had not engaged

in substantial gainful activity since the alleged disability onset date. (R. 13).  At step two, the

ALJ found that A.E.T. had the following severe impairments: (1) ADHD; (2) disruptive disorder;

and (3) IDDM. (*Id.*).  At step three, the ALJ found that A.E.T. did not have an impairment or

combination of impairments that met, or medically or functionally equaled the severity of one of

---

[9] The record does not indicate that A.E.T. was diagnosed with Schizophrenia.

the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, and 416.926). (R. 14–27).  The ALJ assessed the "whole child," evaluating "how [A.E.T.] function[ed] in all settings and at all times, as comparted to other children of the same age who do not have impairments." (R. 16 (citing C.F.R. § 416.926a(b),(c)).  Further, ALJ Suna "considered all [of A.E.T.'s] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. [§] 416.929." (*Id.*).  ALJ Suna additionally "considered the medical source opinions [in the record] in accordance with 20 C.F.R. [§] 416.927." (*Id.*).  The ALJ assigned: (1) partial weight to the state agency consultant's opinion; (2) partial weight to Dr. St. Louis's opinion; (3) partial weight to Dr. Armstein's opinion; (4) partial weight to the 2016 Function Report; and (5) significant weight to Dr. Wilson's interrogatory responses. (R. 20–21). ALJ Suna also considered A.E.T.'s GAF scores, but did not give them "any significant weight." (*Id.*).

## II.  LEGAL STANDARDS

### A.  Standard of Review

"A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled." *Bryan o/b/o L.J.P. v. Comm'r of Soc. Sec.*, 5:16-cv-00987 (TWD), 2017 WL 3530367, at *5 (N.D.N.Y. Aug. 16, 2017).  Instead, the federal court undertakes a two-step analysis. *See McEaney v. Comm'r of Soc. Sec.*, 536 F. Supp. 2d 252, 255 (N.D.N.Y. 2008). First, the court determines whether the ALJ applied the correct legal standards. *See id.*  Where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*,

377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

Second, the court determines whether the ALJ's factual findings are supported by substantial evidence. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).  It is for the ALJ "to pass on the credibility of witnesses . . . and to resolve material conflicts in the testimony." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  Thus, the substantial evidence standard is "very deferential" to the ALJ. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (substantial evidence standard is even more deferential than the "clearly erroneous" standard of review).  Once the ALJ finds facts, the reviewing court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise.*'" *Id.* (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).  Moreover, if the record "supports disparate findings," it is the ALJ's resolution of the evidence that controls. *Quinones on behalf of Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's decision that claimant was not disabled where substantial evidence supported both parties' positions).  The ALJ is, however, required to articulate the "crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  The ALJ

also has an affirmative obligation to develop the record during the administrative hearing due to the nonadversarial nature of the proceeding. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.2008) (citations omitted).  However, if "there are no obvious gaps in the administrative record, and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47).

Furthermore, the ALJ "must accord special evidentiary weight to the opinion of the [claimant's] treating physician," which "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[10] *Botta v. Barnhart*, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007); *accord Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  Nevertheless, the opinions of "[s]tate agency medical and psychological consultants may constitute substantial evidence," if they are "in turn supported by evidence in the record." *McEaney*, 536 F. Supp. 2d at 256 (citing *Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir. 1993)).  ALJs determine how much weight to afford medical opinions of non-examining consultants based on the factors enumerated in 20 C.F.R. § 416.920c(c)(1)–(c)(5).  The most important of these factors are: (1) "supportability," which assesses the "relevan[ce] [of] the . . . supporting explanations presented by" the consultant; and (2) "consistency," which examines the extent to which the opinion is consistent with evidence from "other medical" and "nonmedical" sources. 20 C.F.R. § 416.920c(a), (c)(1), (c)(2).

---

[10] The so-called "treating source" rule, codified in 20 C.F.R. § 416.927(c)(2), which accords "more weight to medical opinions from . . . treating sources," was removed from the SSA's most recent regulations. *See* 20 C.F.R. § 416.920c.  However, the new regulations only apply to claims filed on or after March 27, 2017. *Id.*  Plaintiff filed the instant claim on behalf of A.E.T. on April 24, 2015. (R. 10).  As such, 20 C.F.R. § 416.927, not 20 C.F.R. § 416.920c, applies to this case.

**B.  Legal Standard Governing Evaluation of Disability Claims for Children Under 18**

A child under 18 years-old is entitled to SSI if they have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." *Maldonado on behalf of N.L.M.B. v. Comm'r of Soc. Sec.*, 19 Civ. 8074 (ER)(SN), 2021 WL 1158412, at *1 (S.D.N.Y. Mar. 26, 2021) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)).  The ALJ must follow a three-step sequential analysis to determine whether a child is disabled pursuant to the foregoing standard. *See id.*  First, the ALJ considers whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b).  Second, the ALJ assesses whether the child has a "medically determinable impairment that is severe." 20 C.F.R. § 416.924(c).  An impairment or combination of impairments is "severe" if it causes more than minimal functional limitations. *Id.*  Third, if the ALJ finds that the child suffers from a "severe" impairment or combination of impairments, the ALJ must consider whether the impairment meets or "medically" or "functionally" equals a disability listed in the regulatory "Listing of Impairments" ("Listing") contained in Appendix 1 of the regulations to the Act. 20 C.F.R. § 416.924(d); *see also id.* at Pt. 404, Subpart P, Appx. 1.

If an impairment meets or medically equals a Listing, then the claimant is disabled as a matter of law. *See Mena v. Comm'r of Soc. Sec.*, 1:19-CV-06810 (SN), 2021 WL 1222150, at *11 (S.D.N.Y. Mar. 31, 2021).  To determine whether an impairment functionally equals a Listing, the ALJ considers the child's functioning in six "domains" that are "intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).  In evaluating the child's domains, the SSA "will assess the interactive and cumulative effects of all of the impairments for which [it has] evidence, including any impairments [the child has] that are not 'severe.'" 20 C.F.R. § 416.926a(a) (alterations provided).  The six domains are: (1) acquiring and using

- 16 -

information; (2) attending and completing tasks; (3) interacting and relating with others; (4)

moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-

being. *Id.* A child's impairment functionally equals a Listing if the child has a "marked"

limitation in two of six domains or "extreme" limitations in one of the domains. *See Mena*, 2021

WL 1222150, at *11 (citing 20 C.F.R. § 416.926a(a),(d)). A marked limitation is "'more than

moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). A child has a "marked"

limitation in a domain if their impairments "interfere[] seriously with [their] ability to

independently initiate, sustain, or complete activities." *Id.* An "extreme" limitation exists when

the impairment "interferes very seriously with [the child's] ability to independently initiate,

sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). A rating of extreme is "give[n] to

the worst limitations," but, it "does not necessarily mean a total lack or loss of ability to

function." *Id.*

## III.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further

administrative proceedings because the ALJ, in evaluating functional equivalence, erred in

concluding that A.E.T. had a less than marked limitation in the following domains: acquiring and

using information, attending and completing tasks, interacting and relating with others, and

caring for oneself. (Pl. Br. at 17–24). The Commissioner maintains that the ALJ's determination

that A.E.T. had less than marked limitations in the foregoing domains was supported by

substantial evidence. (Comm'r Br. at 15–24).

Here, the ALJ performed the three-step analysis, first finding that A.E.T. was not

engaged in substantial gainful activity and second determining that A.E.T. had severe

impairments, namely, ADHD, disruptive disorder and IDDM. (R. 13–14). At step three, the ALJ

found that A.E.T.'s severe impairments or combination of impairments did not meet, or were not medically or functionally equal to a Listing. (R. 14–16).  Plaintiff does not dispute that the ALJ fully developed the record, nor does she dispute that the ALJ applied the correct legal standards. Since the only issue is whether the ALJ properly considered whether A.E.T.'s impairments were "functionally equivalent" to a Listing, the Court will evaluate the ALJ's decision regarding each domain in turn.

## A.  Acquiring and Using Information

The acquiring and using information domain considers how well the child "acquire[s] or learn[s] information, and how well [the child] use[s] the information [they] have learned." 20 C.F.R. § 416.926(a)(g).  The regulations provide the following guidance for school-age children:

> [The child] should be able to learn to read, write, and do math, and discuss history and science. [The child] will need to use these skills in academic situations to demonstrate what [they] have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. [The child] will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). [The child] should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [their] own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).  ALJ Suna found that A.E.T. had a less than marked limitation in the acquiring and using information domain. (R. 23).  Plaintiff argues that there is "overwhelming evidence for the ALJ to have found that [A.E.T.] had a marked limitation" in this domain. (Pl. Br. at 17).  The Commissioner counters that the ALJ's determination is supported by substantial evidence. (Comm'r Br. at 17–18).

ALJ Suna's determination that A.E.T. had a less than marked limitation in the acquiring and using information domain is supported by substantial evidence.  ALJ Suna relied on

pediatric consultant Dr. Wilson's opinion that A.E.T. had a less than marked limitation in this domain, which the ALJ afforded "significant" weight. (R. 21, 616).  The opinion of a medical expert such as Dr. Wilson constitutes substantial evidence if it is supported by the record.  *See Schisler*, 3 F.3d at 568.  Dr. Wilson's opinion concerning A.E.T.'s limitations in this domain is corroborated by Dr. Armstein, A.E.T.'s treating physician at Montefiore, and state agency consultant Marinaro, all of whom opined that A.E.T. had less than marked limitations. (R. 111, 363, 368).  Accordingly, Dr. Wilson's opinion satisfies the substantial evidence threshold.  *See Schisler*, 3 F.3d at 568.

In addition to Dr. Wilson's opinion, ALJ Suna specifically relied on A.E.T.'s final fourth-grade report card in reaching his determination. (R. 23).  A.E.T. earned a 70 in English, an 84 in science, an 88 in social studies and an 80 in academic and personal behaviors. (R. 339).  The decision also references the remarks in A.E.T.'s 2016 IEP that A.E.T. "reads in large meaningful phrases, mostly smooth, and with expressive interpretation," has "excellent comprehension skills," and "can express numbers using tens and ones, solve basic subtraction . . . solve problems including counting dollar bills and coins, and construct, create and interpret bar graphs." (R. 23, 330).  Finally, the decision noted A.E.T.'s hearing testimony and statement to Dr. Tsoutsouras that her daily activities include reading books and doing her homework. (R. 479).  In sum, ALJ Suna's decision regarding A.E.T.'s functional limitation in the acquiring and using information domain is supported by substantial evidence.

Plaintiff asserts that the ALJ's decision did not consider contrary record evidence, including that A.E.T. failed nine of her fourth-grade subjects, receives speech and language counseling, and that Plaintiff indicated on the 2016 Function Report that A.E.T. was unable to write a 6 to 7 sentence story. (Pl. Br. at 15–16).  Plaintiff's argument is unavailing.  The question

for the Court "is not whether there is evidence to support disability; it is whether there is 'more than a scintilla' of evidence supporting the ALJ's decision." *Wilson obo J.J.W. v. Comm'r of Soc. Sec.*, Case # 1:19-cv-737-DB, 2020 WL 3447800, at *5 (N.D.N.Y. June 24, 2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Furthermore, where the record evidence supports disparate findings, the ALJ's resolution of the conflicting evidence controls. *See DeChirico*, 134 F.3d at 1182.

In any event, ALJ Suna's decision indicates that he considered the record evidence to which Plaintiff cites.  The decision expressly contemplated that A.E.T.'s academic "performance was very poor at the beginning of the [fourth-grade] school year," before noting that A.E.T. "recover[ed] from her poor performance in almost all her classes and was promoted to the 5th grade." (R. at 19).  Additionally, ALJ Suna considered that A.E.T. repeated the second grade, and based his decision, in part, on the fact that she had since "improve[d] her school performance" and "earn[ed] grade promotion for three years straight." (R. 18).

Furthermore, ALJ Suna afforded only "partial weight" to Plaintiff's comments on the 2016 Function Report because "the record d[id] not show [that A.E.T.'s] limitations [were] as severe as the [Plaintiff] indicated." (R. 21).  The credibility of a witness, including the claimant, is a question of fact for the ALJ to resolve. *See Rosado*, 805 F. Supp. at 153.  The federal court must defer to the ALJ's factual finding if it is supported by substantial evidence. *See id.*  Upon review of the record, it is clear that the ALJ's decision to accord only partial weight to Plaintiff's statement in the 2016 Function Report that A.E.T. could not write a 6 to 7 sentence story is supported by more than a "mere scintilla" of evidence.  Indeed, the 2016 IEP describes how A.E.T. "demonstrate[s] strength in word choice when conveying information about a specified topic to her readers" and is able to "include an introduction [in her writing], elaborate with a

variety of information, organize, use transition words and include a conclusion." (R. 330).  In

sum, the Court concludes that there is more than a scintilla of evidence supporting the ALJ's

decision that A.E.T. had a less than marked limitation in the domain of acquiring and using

information.

## B.  Attending and Completing Tasks

The attending and completing tasks domain assesses how well a child focuses on tasks

and maintains attention. *See* 20 C.F.R. § 416.926a(h).  The regulations provide as follows:

> [The child] should be able to focus [their] attention in a variety of
> situations in order to follow directions, remember and organize [their]
> school materials, and complete classroom and homework assignments.
> [The child] should be able to concentrate on details and not make careless
> mistakes in [their] work (beyond what would be expected in other children
> [their] age who do not have impairments). [The child] should be able to
> change [their] activities or routines without distracting [themselves] or
> others, and stay on task and in place when appropriate. [The child] should
> be able to sustain [their] attention well enough to participate in group
> sports, read by [themselves], and complete family chores. [The child]
> should also be able to complete a transition task (e.g., be ready for the
> school bus, change clothes after gym, change classrooms) without extra
> reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).  ALJ Suna found that A.E.T. had a less than marked limitation in

the attending and completing tasks domain. (R. 24).  Plaintiff argues that there is ample record

evidence to support a finding that A.E.T. had a marked limitation in this domain. (Pl. Br. at 18–

20).  The Commissioner contends that the ALJ's decision was supported by substantial evidence.

(Comm'r Br. at 18–19).  The Court agrees and finds that ALJ Suna's decision is supported by

substantial evidence.

ALJ Suna's conclusion that A.E.T. had a less than marked limitation in the domain of

attending and completing tasks is supported by A.E.T.'s treating physician at Montefiore and

state agency consultant Marinaro's respective determinations that A.E.T. had less than marked

difficulties in this domain. (R. 111, 364).  Furthermore, Dr. St. Louis concluded that A.E.T.

neither struggled to "concentrate without adult supervision [or] stay on task without being reminded," nor "to work independently without bothering others" or "sit still for 10 minutes at a time." (R. 364). Moreover, Plaintiff told Dr. Garcia on December 12, 2015 that A.E.T. "is able to focus and do her homework." (R. 508). Additionally, the ALJ's conclusion is supported by Dr. Garcia's May 2016 treatment note that A.E.T. was "doing well academically" and did not need to start on a stimulant medication, as well as Dr. Tsoutsouras's conclusion that A.E.T. "appeared to have a normal attention span for her age." (R. 476, 540). The decision is further buttressed by A.E.T.'s fourth-grade report card, the 2016 IEP, and the fact that A.E.T. was promoted to the fifth-grade. (R. 330–31, 339). In sum, ALJ Suna's conclusion that A.E.T. had less than marked limitations in the domain of attending and completing tasks is supported by substantial evidence.

Plaintiff's argument that reversal is appropriate because the ALJ's decision did not discuss certain record evidence is unavailing. (Pl. Br. at 18–20). While an ALJ must articulate the factors supporting his findings with "sufficient specificity" to allow the reviewing court to determine whether the findings are supported by substantial evidence, *Barringer*, 358 F. Supp. 2d at 72, it is well-settled that an ALJ need not discuss their analysis of each piece of evidence in the administrative record, *see Brault*, 683 F.3d at 448. "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court finds that ALJ Suna articulated his reasoning for finding that A.E.T. had less than marked limitations in this domain with the requisite specificity for the Court to conduct a substantial evidence review. The fact that the ALJ did not discuss each piece of evidence in the administrative record does not warrant reversal. *See Brault*, 683 F.3d at 448. Nevertheless, ALJ

Suna expressly contemplated some of the evidence that Plaintiff alleges was disregarded.  For example, while Plaintiff argues that ALJ Suna failed to consider the 2016 Function Report's statements that A.E.T. could not complete chores or finish tasks that she started, ALJ Suna explained that he afforded only partial weight to the 2016 Function Report as it was not entirely consistent with the record. (R. 21).  Indeed, Plaintiff's statement that A.E.T. did not complete her chores is inconsistent with certain treatment notes, Dr. Wilson and Dr. Tsoutsouras's conclusions, and A.E.T.'s hearing testimony. (R. 21).  For these reasons, the Court rejects Plaintiff's argument that reversal is necessary because the ALJ did not discuss his consideration of certain evidence. *See Brault*, 683 F.3d at 448.

## C.  Interacting and Relating with Others

The interacting and relating with others domain considers how well the child "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [their] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i).  The regulations provide that school-age children should meet the following standards:

> [The child] should be able to develop more lasting friendships with children who are [their] age. [The child] should begin to understand how to work in groups to create projects and solve problems. [The child] should have an increasing ability to understand another's point of view and to tolerate differences. [The child] should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

ALJ Suna found that A.E.T. had a less than marked limitation in the domain of interacting and relating with others. (R. 24).  Plaintiff argues that the ALJ's determination was erroneous, as the ALJ did not consider relevant evidence in his decision, including, *inter alia*, Plaintiff's testimony that A.E.T. does not play team sports, Singer's notation that A.E.T. did not

"demonstrate reciprocal communication skills," and the facts that A.E.T. has tantrums, has been diagnosed with an adjustment disorder, has behavioral problems at home and at school, and takes Risperidone for irritability and aggression. (Pl. Br. at 20–23). The Commissioner argues that the ALJ's decision was supported by substantial evidence. (Comm'r Br. at 19–20).

The Court finds that substantial evidence exists in the record to support the ALJ's determination. Dr. Wilson opined that A.E.T. had less than marked limitations in this domain. (R. 616). Dr. Wilson's opinion is consistent with Dr. Tsoutsouras's finding that A.E.T. related to him and his staff in "an age-appropriate way" and presented "normal" behavior for her age, as well as comments in the 2013 and 2016 IEPs that A.E.T. has "many friends" and is "really good at keeping friends." (R. 255, 330, 476). Dr. Wilson's opinion therefore constitutes substantial evidence. *See Schisler*, 3 F.3d at 568. In addition, ALJ Suna's determination is supported by the 2016 IEP, which further indicates that A.E.T. enjoys working in small groups and describes that A.E.T. "can be very sociable if the setting is comfortable," and "even takes the lead role." (R. 375). A.E.T. is additionally described as "respectful," a "team player" and "witty," which is consistent with Plaintiff's comment during a March 25, 2015 counseling session that A.E.T. is a "very sociable" child and Plaintiff's notation on the 2016 Function Report that A.E.T. has friends her own age, can make new friends, and generally gets along with teachers and other adults. (R. 276, 441). Furthermore, despite Plaintiff's indication that A.E.T. does not play team sports, A.E.T. testified during the hearing that she played dodgeball, basketball and kickball after school with friends. (R. 68–69).

Additionally, the ALJ considered that A.E.T.'s treatment records indicated an improvement in her behavior and social interactions. (R. 25). An ALJ may properly consider whether a claimant improves with treatment in determining whether the claimant is disabled if

substantial evidence supports the ALJ's conclusion that the claimant has shown improvement. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013).  Here, Plaintiff reported to Zaiter in December 2015 that A.E.T. "has shown great improvement" and is "listening more." (R. 509).  Plaintiff conveyed in January 2016 that A.E.T. "is improving her behavior overall." (R. 512).  A.E.T. told Dr. Garcia in January 2016 that restarting Risperidone helped her sleep and "calm[] down," and again reported in February 2016 that the medication helps her "learn more school work." (R. 513, 519).  Plaintiff also told Dr. Garcia that A.E.T. seemed much calmer after starting the medication and was acting more respectfully at home. (R. 521, 538).  Indeed, Zaiter remarked in a May 2016 treatment note that A.E.T. "appeared to be happier and more relaxed." (R. 543).  Accordingly, substantial evidence supports the fact that A.E.T. improved with treatment, which was properly considered by the ALJ. *See Reices-Colon*, 523 Fed. App'x at 799. In sum, there is substantial evidence in the administrative record to support ALJ Suna's determination that A.E.T. had a less than marked limitation in the interacting and relating with others domain.

**D.  Caring for Oneself**

The caring for oneself domain considers how well a child maintains a healthy physical and emotional state, including how well the child satisfies her physical and emotional needs in an appropriate manner. 20 C.F.R. § 416.926a(k).  This encompasses how the child copes with stress and changes to her environment, as well as the way in which the child takes care of her own health, possessions and living quarters. *See id*.  The regulations describe the appropriate functioning of a school-age child as follows:

> [The child] should be independent in most day-to-day activities (e.g., dressing [and] bathing . . .), although [the child] may still need to be reminded sometimes to do these routinely. [The child] should begin to recognize that [they] are competent in doing some activities and . . . have difficulty with others. [The child] should be able to identify those

> circumstances when [they] feel good about [themselves] and when [they]
> feel bad. [They] should begin to develop understanding of what is right
> and wrong, and what is acceptable and unacceptable behavior. [They]
> should begin to demonstrate consistent control over [their] behavior[] and
> . . . avoid behaviors that are unsafe or otherwise not good for [them]. [The
> child] should begin to imitate more [adult] behavior[s] . . .

20 C.F.R. § 416.926a(k)(2)(iv).  ALJ Suna determined that A.E.T. had less than marked

limitations in this domain. (R. 26).  Plaintiff argues that the ALJ's decision was in error and that

the ALJ "failed to consider" relevant evidence including Plaintiff's statements that A.E.T. was

unable to, *inter alia*, shower by herself or help around the house, the fact that A.E.T.'s glucose

levels were erratic and uncontrolled, and that A.E.T. had 42 absences from fourth grade. (Pl. Br.

at 23–24).  The Commissioner argues that substantial evidence supports the ALJ's finding that

A.E.T. had less than marked limitations in the domain of caring for oneself. (Comm'r Br. at 23–

24).

     The Court agrees with the Commissioner that ALJ Suna's determination is supported by

substantial evidence.  Dr. Wilson opined that A.E.T. had less than marked limitations in this

domain, (R. 617), which is corroborated by A.E.T.'s provider at Montefiore and Marinaro's

respective conclusions that A.E.T. had a less than marked limitation in the domain of caring for

oneself. (R. 112, 364, 617).  Dr. Wilson's opinion is also consistent with the 2016 Function

Report, in which Plaintiff indicated that A.E.T. can button clothing by herself, brush her teeth,

choose her own clothing and put away her toys, as well as A.E.T.'s testimony at the hearing that

she cleaned her room once a week. (R. 26).  Accordingly, Dr. Wilson's opinion constitutes

substantial evidence. *See Schisler*, 3 F.3d at 568.

     Furthermore, Plaintiff's contention that the ALJ did not consider certain record evidence

is without merit.  The ALJ's reasoning is sufficiently specific for the Court to conduct a

substantial evidence review. *See Barringer*, 358 F. Supp. 2d at 72.  As discussed, *supra*, the ALJ

need not articulate their evaluation of each item of evidence to meet the substantial evidence standard. *See Brault*, 683 F.3d at 448.  Regardless, ALJ Suna considered much of the evidence cited by Plaintiff.  For example, Plaintiff argues that ALJ Suna failed to consider A.E.T.'s glucose levels. (Pl. Br. at 23).  However, the decision discussed how A.E.T.'s diabetes was problematic "during periods of non-compliance and poor diet control." (R. 17).  ALJ Suna specifically noted that A.E.T. missed follow up appointments with Dr. St. Louis, struggled with medication compliance, and that Plaintiff "admitted that she at times forgets to give [A.E.T.] medication before she eats, as prescribed." (*Id.*).  Indeed, ALJ Suna determined that A.E.T. had "more than no limitations" in this domain, specifically because A.E.T. needed assistance in managing her medication and diet while at home and at school. (*Id.*).  Plaintiff also alleges that the ALJ did not consider A.E.T.'s absences from fourth grade. (Pl. Br. at 23).  The ALJ did, however, consider A.E.T.'s absences on several occasions. (*See, e.g.*, R. 19, 24).  Thus, the Court rejects Plaintiff's contention that the ALJ's alleged failure to consider certain evidence warrants remand.

In conclusion, the Court finds that ALJ Suna's determinations that A.E.T. suffered less than marked limitations in the acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself domains were supported by substantial evidence.  As such, the Court concludes and respectfully recommends finding that the ALJ's conclusion that A.E.T. was not disabled under the Act is supported by substantial evidence.

## IV.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend denying Plaintiff's motion for judgment on the pleadings and granting the Commissioner's cross-motion.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  A party may respond to another party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:    June 30, 2021
          White Plains, New York

                                        **RESPECTFULLY SUBMITTED:**

                                        *Judith C. McCarthy*
                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge

- 28 -